UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| DARLINE GREGORY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 2:13-cv-0016 |
| v. | ) |
| | ) Judge Sharp |
| NIC GLOBAL, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

Defendant NIC Global filed a Motion for Summary Judgment (Docket Entry No. 20), to which Plaintiff Darline Gregory filed a response in opposition (Docket Entry No. 30), and Defendant filed a reply (Docket Entry No. 36).

## I. FACTUAL BACKGROUND

Darline Gregory ("Plaintiff") began her employment with NIC Global[1] ("Defendant" or "NIC") on May 31, 2011 as a Second Shift Production Supervisor.[2] She supervised 25 to 30 individuals, and one of those employees was Glenn Reed ("Reed").[3]

Prior to February 2012, Plaintiff interacted with Reed in the same manner she interacted with all the other employees. (Plaintiff Depo., p. 29). Plaintiff walked during lunch for the

---

[1] NIC provides custom manufacturing solutions to its customers. It uses sheet metal, molded plastic, aluminum and other building materials to manufacture products used in various industries, including both the automotive and medical industries. (Conn Decl. at ¶ 4).

[2] Unless otherwise noted, the facts are drawn from *Plaintiff's Response to NIC Global's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, NIC Global's Response to Plaintiff's Statement of Undisputed Material Facts* (Docket Entry Nos. 32 and 35), and declarations and other related exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

[3] Reed is no longer employed with NIC.

1

company health program, and Reed was usually present among all of the other employees. (*Id.*). Plaintiff and Reed would talk about family while they walked – discussing her marriage and religion, as her husband is a minister. (*Id.*, p. 30; Conn Depo., p. 45).

While making her rounds on February 2, 2012, Plaintiff had a conversation with Reed, wherein he made inappropriate comments of a sexual nature. Plaintiff handled it the best she could and thought she had dealt with the situation by advising Reed that she did not appreciate what he had said. Nevertheless, Reed continued making comments to Plaintiff. (Plaintiff Depo., p. 32).

On February 10, 2012, Plaintiff sent an email to NIC's HR Manager, Julie Conn ("Conn"), reporting the comments Reed made to her. Plaintiff explained in her email that, while she and Reed were discussing "men and women in the workplace," he said to her "most women that say they wont [*sic*] run around on their spouse[,] usually do." (Plaintiff Depo. at Ex. 7). Plaintiff prefaced her email by saying she didn't "think that it [was] any big deal," and at the end of the email, Plaintiff informed Conn that, after she told Reed his "most women" comment was "upsetting" to her, "everything seemed good." (*Id.*). In response to the email, Conn thanked Plaintiff for letting her know about their conversation and explained that Plaintiff's "discussion with [Reed] afterwards was appropriate" and that "as a supervisor, it's important to ensure our employees understand about boundaries and inappropriate conversations." (*Id.*).

Plaintiff sent another email to Conn on February 16, 2012, advising that Tony Jones, a co-worker, came to her and expressed deep concern for Plaintiff and she needed to watch her back. (Plaintiff Depo., Ex. 8). Plaintiff also stated that she now thought "this could be a problem." (*Id.*). Conn responded to the email by thanking Plaintiff for letting her know and explaining that NIC would follow-up in greater detail when she came to work later that day.

Plaintiff met with her immediate supervisor, Thomas Cooper ("Cooper"), and NIC's Vice President of Operations, Troy Wood ("Wood"), when she arrived at work the evening of February 16, 2012. In the meeting, Plaintiff explained the things that she had already reported to Conn and additionally stated that another employee, Yvonne Tyson ("Tyson"), recently told her that Reed made some inappropriate comments to her as well.

During this meeting, Wood asked Plaintiff if she had said or done something to make Reed think of her in that way. This made Plaintiff feel as though NIC was blaming her for the situation. However, Wood did not know his questions about Plaintiff's relationship and interactions with Reed made her feel that way. Rather, he was trying to "get to the bottom" of the events that had transpired, so NIC could understand all the facts. (Wood. Decl. at ¶ 9).

Conn, Cooper and Wood interviewed Jones, Tyson and Reed[4] on February 16, 2012 after Cooper and Wood's initial meeting with Plaintiff. After the interviews, NIC decided to suspend Reed until it could determine what had happened and the most appropriate response. (Conn. Decl. at ¶ 7; Wood Decl. at ¶ 6). After completing their interviews, Conn, Cooper, and Wood then met again with Plaintiff near the end of her shift. During this meeting, they explained to her where the investigation stood and asked her what she wanted to see happen to Reed in order to resolve her concerns. Plaintiff explained that she did not want Reed to be fired and did not otherwise specify any resolution that she wanted. (Plaintiff Depo., p. 29).

---

[4] During the interview, Reed expressed he felt that he and Plaintiff had a friendly relationship because they walked together at lunch and had personal conversations. He admitted making the comment about "most women" but said it was taken out of context and that he did not direct the comment to Plaintiff. He otherwise denied making any inappropriate sexual remarks to anyone. *See* (Conn Decl. at ¶ 6, Ex. A; Wood Decl. at ¶ 5, Ex. A).

On February 20, 2012, Cooper informed Plaintiff that NIC had decided to transfer Reed to first shift so Plaintiff would not have to work directly with him anymore.[5] At the time, Plaintiff was pleased with the solution.

However, as it turned out, Plaintiff still saw Reed at work when he stayed over in the evenings with the shipping position.[6] Plaintiff was very uncomfortable and made it a point to know where Reed was in the building when he worked into her shift. Reed would walk by Plaintiff, not say anything to her, but stare at her. Plaintiff told Cooper about the issue and how she felt, but Cooper was only concerned if she and Reed had anymore conversations. (Plaintiff Depo., pp. 43-44).

Plaintiff was later informed by another employee, Lee Hunter ("Hunter"), that Reed had made advances at her and asked her out. (Plaintiff Depo., p. 66). Reed spent a lot of time in Hunter's work area appearing to be doing work but would stare at her. (Conn Depo., p. 54). Plaintiff reported the conversation with Hunter to Wood.[7] (Plaintiff Depo., p. 66).

After reporting the sexual harassment by Reed, Plaintiff began to be harassed by management. Plaintiff began to be micro-managed by her supervisor, Cooper. Also, Wood no longer seemed to have confidence in Plaintiff in her job or the decisions she was making. He was sterner and appeared unhappy with her. In fact, she was told by Wood that if she made another statement about Reed that they were getting paperwork together for her and would terminate her. (Plaintiff Depo., p. 49-52).[8]

---

[5] Reed was also formally disciplined for his conduct. *See* (Conn Decl. at ¶ 10, Ex. B; Wood Decl. at ¶ 12).

[6] Conn knew that Plaintiff and Reed's schedules would sometimes overlap.

[7] Hunter later reported Reed's conduct to Conn. (Conn Depo., p. 54).

[8] NIC denies this allegation. *See* (Wood Decl. at ¶ 8).

Because of the lack of confidence and statements made by management, Plaintiff believed she had no choice but to resign from NIC. (Plaintiff Depo., p. 55). After Plaintiff resigned, she was replaced with Paul Crabtree, a male in his fifties.[9]

## II. ANALYSIS

Plaintiff has brought a claim pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*("Title VII") for gender discrimination, and asserts an additional claim of age discrimination under the Age Discrimination in Employment Act ("ADEA") of 1967, as amended, 29 U.S.C. § 621 *et seq*. Defendant has moved for summary judgment on both claims.

**A. Summary Judgment Standard**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a

---
[9] Plaintiff was 51 years old at the time of her resignation, and Crabtree was 57 years old.

genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Gender Discrimination and Age Discrimination Claims

Plaintiff asserts both a gender discrimination claim pursuant to Title VII and a claim of age discrimination under the ADEA.

To establish a *prima facie* case of unlawful gender discrimination, Plaintiff must show that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Vincent v. Brewer Co.,* 514 F.3d 489, 494 (6th Cir. 2007) (quoting *Peltier v. United States,* 388 F.3d 984, 987 (6th Cir. 2004)).

Under the ADEA,[10] a plaintiff must show the following to establish a *prima facie* case of age discrimination, "that (1) he was at least 40 years old at the time of the alleged discrimination, (2) he was subjected to an adverse employment action, (3) he was otherwise qualified for the position, and (4) he was rejected and someone outside the protected class was selected." *Harris v. Metro. Govt. of Nashville and Davidson County*, 594 F.3d 476, 485 (6th Cir. 2010).

---

[10] Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his ... employment" based on age. 29 U.S.C.A. § 623(a)(1) (2008).

In the absence of direct evidence, courts analyze both Title VII and ADEA claims using the evidentiary framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Here, Plaintiff does not attempt to prove discrimination by the use of direct evidence. Where a plaintiff must prove discrimination by the use of indirect, rather than direct evidence, she must submit evidence from which a reasonable jury could conclude both that she has established a *prima facie* case of discrimination and that Defendant's "legitimate, nondiscriminatory reason" for its action, if any, is pretext for unlawful discrimination. *Id.* at 802–05.

Both causes of action require Plaintiff to show that she suffered an adverse employment action. The primary issue in Defendant's motion for summary judgment is whether Plaintiff's resignation constitutes constructive discharge, which in turn, would satisfy the "adverse employment action" element in both her *prima facie* cases. Defendant contends Plaintiff cannot satisfy this element.

An adverse employment action has been defined as a "materially adverse change in the terms and conditions of a plaintiff's employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (*en banc*) (citation omitted). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Here, Plaintiff contends she was constructively discharged from her employment on March 1, 2012,[11] when she resigned after her working conditions "became so intolerable [that] resignation was her only alternative." (Docket Entry No. 30 at 12). Specifically, Plaintiff asserts the following three "events and occurrences" led to her ultimate

---
[11] She announced her intention to resign on February 27, 2012.

adverse employment action, "which is constructive discharge:" "1) that by questioning her about her relationship and interactions with Reed, NIC blamed her for Reed's inappropriate comments; 2) that Defendant's employees scrutinized her job performance after she complained of being harassed by Reed; and 3) that Wood told Plaintiff she might be fired if she made a similar complaint in the future." (*Id.* at 9-10).

When an employee resigns, she can show she was constructively discharged by demonstrating that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *West v. Tyson Foods, Inc.,* 374 F. App'x 624, 639–40 (6th Cir. 2010) (quoting *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir. 1982)). In order to prove she was constructively discharged, Plaintiff must show "1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Logan v. Denny's, Inc.,* 259 F.3d 558, 568–69 (6th Cir. 2001). The Court must examine "the employer's intent and the employee's objective feelings," *id.* at 569, and "[a] plaintiff must show that the employer intended and could reasonably have foreseen the impact of its conduct on the employee," *Ford v. Gen. Motors Corp.,* 305 F.3d 545, 554 (6th Cir. 2002).

The Sixth Circuit has adopted the following to determine "whether a work environment rises to the level of compelling an employee to leave:"

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Ross v. Pfizer, Inc.,* 375 F.App'x 450, 457 (6th Cir. 2010) (citing *Logan,* 259 F.3d at 569). None of these factors are present in this case. Plaintiff's own deposition testimony shows that, at most,

8

she complained of Reed's conduct on four occasions over a span of two weeks.[12]  After Plaintiff voiced complaints about Reed the second time, the evidence shows Reed's inappropriate comments to her ceased.  Furthermore, Defendant promptly took the necessary steps to separate the two individuals by moving Reed to a second shift position.  Although their schedules would ultimately overlap at times, Plaintiff was initially satisfied with how the situation was handled by Defendant.

No evidence has been presented that would suggest Defendant engaged in any action with intent that Plaintiff resign or that it could have reasonably anticipated Plaintiff would feel forced to resign.  Furthermore, Plaintiff has failed to show that her working conditions were so difficult or unpleasant that a reasonable person in her situation would have felt compelled to resign.

Plaintiff has not established that she was constructively discharged, and, consequently, Plaintiff has not shown any "adverse employment action" for the purposes of her gender and age discrimination claims.[13]  Because the Court concludes that Plaintiff cannot establish a *prima*

---

[12] The record reflects Plaintiff complained twice on her behalf and two additional times on behalf of Tyson and Hunter.

[13] Although Plaintiff has indicated the ultimate adverse employment action in this matter is her alleged constructive discharge, the Court will briefly address the "three events and occurrences" that Plaintiff asserts led to her resignation.  *See* (Docket Entry No. 30 at 9-10).  It is Plaintiff's belief that Defendant blamed her for Reed's inappropriate conduct and that Defendant's employees scrutinized her job performance after she complained about Reed's conduct.  (*Id.*).  "The Sixth Circuit has consistently held that de minimis employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).  Furthermore, a " 'bruised ego' is simply not enough to constitute an adverse employment action." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004).  Based on the facts presented to the Court, Defendant's conduct towards Plaintiff does not qualify as an adverse action.

Additionally, Plaintiff alleges a comment was made by Wood threatening termination of her employment.  The Sixth Circuit has held that a threat to discharge is not an adverse employment action. *Plautz v. Potter*, 156 F.App'x 812, 817 (6th Cir. 2005).  "Mere threats of alleged adverse employment actions are generally not sufficient to satisfy the adverse action requirement." *Mitchell v. Vanderbilt Univ.,* 389 F.3d

*facie* case of discrimination, it need not proceed to the remaining steps of the *McDonnell Douglas* analysis.

### III. CONCLUSION

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 20) will be granted and this case will be dismissed with prejudice.

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

177, 182 (6th Cir. 2004). There is no dispute that Wood never carried out the alleged threat to terminate Plaintiff, and the threat to discharge by itself is not an adverse action.